IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NUMBER BO 823PP1308460, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) | Case No. 1:18-cv-1421 |
| v. | ) | |
| | ) | |
| ADVANFORT COMPANY, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This declaratory judgment case arises from a dispute between the parties regarding whether a maritime insurance policy issued by plaintiffs ("the Policy") covers defendant's alleged damages and liabilities stemming from an incident in October 2013, in which the Indian government seized the SEAMAN GUARD OHIO ("the *OHIO*"), a vessel operated by defendant, detained the guards and crew aboard the *OHIO* ("Guards" and "Crew"), and charged the Guards and Crew with illegally importing weapons into the country ("the Incident"). Before the Court in this matter are (i) plaintiffs' motion for summary judgment and (ii) defendant's cross-motion for summary judgment.[1] ECF Nos. 94, 100.

A summary judgment decision in one party's favor will necessarily decide the issue against the other party because the counterclaims in AdvanFort's Third Amended Counterclaims ("TAC") are essentially the reverse of the claims in plaintiffs' First Amended Complaint ("FAC"). The dispositive issue for both plaintiffs' FAC and AdvanFort's TAC is whether or not

---

[1] Plaintiffs' motion to dismiss defendant's Third Amended Counterclaims also remains pending before the Court. Disposition of the parties' summary judgment motions, however, will render plaintiffs' motion to dismiss moot.

1

the Policy provides coverage for any claims arising out of the Incident. The summary judgment motions have been fully briefed and argued and are thus ripe for disposition.

## I.

The procedural history of this case pertinent to the resolution of the pending summary judgment motions may be succinctly stated. On December 4, 2018, plaintiffs filed their FAC, seeking a declaratory judgment against defendant AdvanFort that plaintiffs had no obligation to provide insurance coverage to AdvanFort with respect to any damage, loss, and/or expense incurred as a result of the Incident. Specifically, the FAC sought declaratory relief that:

- There is no coverage under the Policy for AdvanFort's vessel damage claim,

- There is no coverage for AdvanFort under Section 1 (General Marine Liabilities) of the Policy for any losses arising out of the Incident,

- There is no coverage for AdvanFort under Section 2 (Marine Employers Liability) of the Policy for any losses or expenses arising out of the Incident,

- Plaintiffs have no duty to provide AdvanFort with a defense against non-existent professional indemnity claims under Section 3 (Professional Indemnity) of the Policy,

- There is no coverage for AdvanFort under Section 4 (Maritime Personal Accident) of the Policy for any losses arising out of the Incident,

- There is no coverage under the Policy for failure of a condition precedent to coverage – namely, at the time of the Incident, the *OHIO*, its Crew, and the Guards were not engaged in fulfilling any contract with a client of AdvanFort for the provision of Insured Services,

- AdvanFort is not entitled to reimbursement of any mitigation or claim expenses under the Policy,

- There is no coverage under the Policy due to a general exclusion to coverage – namely, at the time of the Incident, the *OHIO* was operated by AdvanFort and had not been declared to plaintiffs, or accepted by plaintiffs, under the Policy,

- There is no duty to defend the Crew or the Guards under the Policy.[2]

On April 18, 2019, AdvanFort filed their Third Amended Counterclaims ("TAC"), seeking (i) declaratory relief that the Incident was covered under the Policy, (ii) damages for plaintiffs'

---

[2] *See* First Amended Complaint, ECF No. 7, ¶¶ 57-133.

breach of their obligations under the Policy, and (iii) additional damages based on plaintiffs' bad faith breach of the Policy.[3] Plaintiffs filed a motion to dismiss defendants' TAC on May 2, 2019, which remains pending.

Plaintiffs efforts to conduct discovery met with resistance from defendant from the outset, as defendant repeatedly provided inadequate answers to plaintiffs' interrogatories.[4] Accordingly, on July 25, 2019, the Magistrate Judge granted, in part, plaintiffs' motion for discovery sanctions pursuant to Rule 37(b)(2)(A)(ii), Fed. R. Civ. P. ECF No. 89. Specifically, the July 25th Order concluded that the appropriate remedy, to which plaintiffs were entitled for defendant's discovery defalcations, was as follows:

> Defendant is limited to the answers provided in its Second Amended Response at summary judgment and trial. Defendant may not deviate from those answers in any regard, including any attempts to further "clarify" its answers. Nor may Defendant, either at summary judgment or trial, use, introduce into evidence, or even reference any documents, testimony, or information not already provided to Plaintiffs through discovery. Should Defendant fail to follow this Order, Plaintiffs may seek supplemental sanctions. ECF No. 89 at 17.

In granting plaintiffs' motion for discovery sanctions, the Magistrate Judge concluded that (i) defendant had acted in bad faith by failing to comply with the Magistrate Judge's earlier discovery orders, (ii) defendant's non-compliance with the Magistrate Judge's earlier discovery orders severely prejudiced plaintiffs, and (iii) the need for deterrence in this case weighed in favor of a significant sanction. ECF No. 89, 14-16.

---

[3] It is worth noting defendant's path to the TAC. Defendant's First Amended Counterclaims were dismissed by Order dated March 8, 2019 because defendant had not alleged facts identifying (i) any claims made against defendant related to the Incident or (ii) the factual circumstances of those claims. *See* ECF No. 35. Defendant's Second Amended Counterclaims were dismissed by Order dated April 16, 2019 because defendant had not pled adequately the factual circumstances of the claims allegedly made by the Guards and Crew against defendant. *See* ECF No. 50. Defendant's TAC represent defendant's most recent, and final, attempt to amend their counterclaims.

[4] For a more detailed account of the protracted discovery process in this case, *see* Order on Defendant's Objection to Magistrate Judge's Order, October 16, 2019, ECF No. 121 at 1-4; Memorandum Opinion and Order on Plaintiffs' Motion for Discovery Sanctions, July 25, 2019, ECF No. 89 at 2-6.

On August 20, 2019, plaintiffs filed a motion for summary judgment. ECF No. 94, 95. On September 3, 2019, defendant filed a motion in opposition to plaintiffs' motion for summary judgment and a cross-motion for summary judgment ("Defendant's SJ Motion"). ECF No. 100, 101.

In response to Defendant's SJ Motion, plaintiffs filed a motion for supplemental sanctions, alleging defendant violated the July 25th Order in Defendant's SJ Motion. ECF No. 105. On October 2, 2019, the Magistrate Judge granted, in part, plaintiffs' motion for supplemental sanctions (the "October 2nd Order"). ECF No. 113. On October 7, 2019, defendant filed an objection to the sanctions imposed by the Magistrate Judge's October 2nd Order. ECF No. 115. On October 9, 2019, the Magistrate Judge awarded plaintiffs $28,468.90 in attorney fees and costs in relation to the July 25th Order and the October 2nd Order. Most recently, by order dated October 16, 2019, defendant's objection to the Magistrate Judge's October 2nd Order was overruled. Specifically, the October 16th Order concluded that the Magistrate Judge's October 2nd Order was not clearly erroneous, but instead clearly correct.

Accordingly, at this time, the following matters are at issue and ripe for disposition: (i) plaintiffs' motion for summary judgment and (ii) defendant's cross-motion for summary judgment. For the reasons that follow, there is no genuine dispute as to any material fact, and summary judgment must be entered in favor of plaintiffs and against defendant.

## II.

The first step in resolving the summary judgment motions is to be clear as to the content of the summary judgment factual record. The July 25th and October 2nd Orders, which granted, in part, plaintiffs' motions for sanctions, have established much of the summary judgment factual record in this case. *See* ECF No. 89, 113. Specifically, the October 2nd Order did three things: (i)

it struck the August 30, 2019 declarations from Ahmed Farajallah and Samir Farajallah (collectively, the "Farajallah Declarations") (ECF Nos. 101-2, 101-3); (ii) it struck paragraphs 1, 3-6, and 8-16 of defendant's statement of undisputed facts in Defendant's SJ Motion (ECF No. 101); and (iii) it deemed undisputed paragraphs 2, 7, 10-13, 16, and 25 of plaintiffs' brief in support of their motion for summary judgment (ECF No. 95).[5]

As a result, the statement of undisputed material facts listed below is based substantially on plaintiffs' statement of undisputed facts. Defendant's remaining undisputed facts and remaining disputes with plaintiffs' facts, after taking into account the effect of the October 2nd Order and the October 16th Order, have been incorporated where relevant and discarded where immaterial.

1. The Policy attached to plaintiffs' First Amended Complaint ("FAC"), policy no. B0823PP1308460, is the insurance policy at issue in this case.[6]

2. The Policy named defendant, AdvanFort Company Inc., as the Insured and covered the period from July 19, 2013 to August 1, 2014.[7]

3. At the time of the Incident, October 2013, AdvanFort operated the *OHIO*.[8]

---

[5] By virtue of the Magistrate Judge's October 2nd Order, which was affirmed by the October 16th Order, the Farajallah Declarations were struck from the summary judgment record because they were untimely. *See* Order on Defendant's Objection to Magistrate Judge's Order, October 16, 2019, ECF No. 121. Each of the paragraphs ordered stricken from Defendant's SJ Motion relied exclusively on the Farajallah Declarations. ECF No. 101 at 6-11. And defendant also cited solely to the Farajallah Declarations to support their disputes with paragraphs 2, 7, 10-13, 16, and 25 of plaintiffs' brief in support of their motion for summary judgment. ECF No. 101 at 2-6. Because defendant disputes paragraphs 2, 7, 10-13, 16, and 25 of plaintiffs' brief in support of their motion for summary judgment solely based on citations to the stricken Farajallah Declarations, those paragraphs are deemed admitted as part of the summary judgment record. *See Caban Hernandez v. Phillip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007) (in circumstances where the nonmoving party has not cited to the admissible summary judgment record "a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated."); *Foglia v. Clapper*, 885 F. Supp. 2d 821, 823 (E.D. Va. 2012) (same).

[6] FAC, ECF No. 7, ¶¶ 1-2; Def.'s Am. Answer, ECF No. 21, ¶¶ 1-2.

[7] Policy at *1 (cover page), *2 ("Period").

[8] FAC, ECF No. 7, ¶ 4; Def.'s Am. Answer, ECF No. 21, ¶ 4.

4. At the time of the Incident, AdvanFort leased the *OHIO* through a charter contract (the "Charter Party") with Seaman Guard, Inc. ("SGI"), the owner of the *OHIO*, that expired on March 15, 2015.[9]

5. AdvanFort never declared the *OHIO* to plaintiffs for coverage under the Policy, as required by General Exclusion 5 of the Policy.[10] Accordingly, plaintiffs did not accept the *OHIO* as part of the risk to be insured under the Policy.[11]

6. Normally, the *OHIO* operated between the southern tip of India and Sri Lanka, where it would deliver guards to client vessels heading west into the Indian Ocean and retrieve guards from client vessels heading east out of the Indian Ocean.[12]

7. The Guards were not AdvanFort employees.[13]

8. Members of the *OHIO*'s Crew were not AdvanFort employees.[14]

9. At the time of the Incident, the Guards were aboard the *OHIO* as passengers – the Guards were not assigned to, nor were they actively engaged in, off-shore security services.[15]

---

[9] Def.'s Interrog. Responses at 18; BIMCO Standard Bareboat Charter between Seaman Guard, Inc. and AdvanFort, ECF No. 20-4 (Ex. 3 to Supp. Decl. of A. Farajallah), blocks 13, 20.

[10] Ian Brazier Decl. ¶¶ 24-31, ECF No. 27-46 (AdvanFort did not declare any vessels); *see generally* the Policy (which does not mention the *OHIO* anywhere in the contract).

Defendant's proposed undisputed material fact 17, which was unaffected by the October 2nd and October 16th Orders, offers four documents as evidence that defendant declared the *OHIO* to plaintiffs as part of AdvanFort's application for the Policy. Defendant's argument that these four documents represent a declaration of the *OHIO* to plaintiffs is unpersuasive, as further discussed *infra* in VI.A.

[11] Policy (not mentioning the *OHIO* anywhere in the contract); Def.'s 2d Am. Responses to Pls.' 1st Interrogatories, ECF No. 84 [hereinafter, "Interrogatory Responses"] at 16 (stating that the *OHIO* was accepted merely by the Policy being issued); *cf.* Ian Brazier Decl. ¶¶ 24-25, ECF No. 27-46 (plaintiffs' acceptance of vessels declared by AdvanFort would have required written acknowledgement of the vessels listed on a risk schedule).

Defendant disputes this fact by arguing that the Policy's clear terms include claims involving the *OHIO*. Defendant's argument is unpersuasive, as further discussed *infra* in VI.A.

[12] A. Farajallah Dep. at 104:16-23, 105:12-18, 106:4-107:2, ECF No. 95-3; Ex. 3 to S. Farajallah Dep. (Jan. 27, 2014 letter of S. Askins), ECF No. 95-4. It is important to note that although the August 30, 2019 Farajallah Declarations were stricken from the summary judgment record as untimely, Ahmed and Samir Farajallah's deposition testimony, which was taken during discovery, remains a part of the summary judgment record.

[13] Def.'s Interrog. Responses at 18.

[14] Def.'s Interrog. Responses at 18.

[15] FAC, ECF No. 7, ¶ 4; Def.'s Am. Answer, ECF No. 21, ¶ 4 (the Guards were passengers); FAC ¶ 41, Answer ¶ 41 (the Guards were "await[ing] assignment to an off-shore security services engagement"); Def.'s Interrog. Responses

10. At the time of the Incident, the *OHIO* was anchored and taking on fuel and supplies; it was not heading to meet a client vessel.[16]

11. During the Incident, the Crew and Guards did not suffer any injuries, sickness, or disease. More specifically, any alleged injuries, sickness, or disease occurred during, and solely as a result of, their subsequent detention by Indian authorities.[17]

12. AdvanFort claims it paid $120,000 to the Guards and Crew in November 2013 (hereinafter, the "November 2013 Payment") to settle, or partially settle, their purported claims against AdvanFort. If any such payment occurred, it was a payment of back wages or "comfort money,"[18] not a payment for any bodily injury claim associated with the Incident.[19]

13. AdvanFort claims that it promised the Guards and Crew that, "if more money comes in, we will pay more."[20]

14. AdvanFort does not know what, if any, physical injuries any of the Crew or Guards suffered or allegedly suffered during their detention, where any of the injuries, if any, occurred, when any of the injuries, if any, occurred, or what any

---

at 16 ("AdvanFort does not know the activities of individual guards during [the 24-hour period immediately preceding the Incident]."); Decl. of Paul Towers ¶ 7 ("At the time, there were twenty-four other guards on the OHIO. None of us were conducting any security work at that point. We were all passengers."), John Armstrong Decl. ¶ 6 (same), Nicholas Dunn Decl. ¶ 6 (same), Ray Tindall Decl. ¶ 6 (same), William Irving Decl. ¶ 6 (same), ECF No. 95-8-12.

[16] A. Farajallah Dep. Ex. 15 (Bates No. A002746), ECF No. 95-6 (email in which AdvanFort directed *OHIO*'s master to refuel via barrels floated to the vessel from an Indian fisherman and to lie to the Indian Coast Guard about the refueling); A. Farajallah Dep. Ex. 16, ECF No. 95-7 (AdvanFort Incident Report, which explains that the *OHIO* was refueling offshore because the *OHIO* was a non-IACS (International Association of Classification Societe) ship and thus prohibited from calling on Indian ports); A. Farajallah Dep. at 132:4-145:25, ECF No. 95-3.

[17] Def.'s Interrog. Responses at 7 (asserting that the Crew's and Guards' claims all concerned harms that occurred while the Crew and Guards were imprisoned in India); A. Farajallah Dep. Ex. 16, ECF No. 95-7 (AdvanFort Incident Report) (including no report of any injuries).

[18] "Comfort money" is a term used by Samir Farajallah to denote money given to the Crew and Guards so that they could buy food and pay hotel bills while out on bail in India awaiting trial. *See* S. Farajallah Dep. at 192:25-195:10.

[19] A. Farajallah Dep. at 186:2-17, 189:3-11, 189:22-192:6, 192:12-198:11, 212:14-18, 213 15-18, 218:18-219:19, 222:25-223:3; S. Farajallah Dep. at 169:8-11, 170:13-14 ("I'm paying them for their time in jail."), 172:10-12 ("[W]e calculated that based on what would be a contractor... receiving outside the jail if he's not in jail[.]"), 114:18-24 (November 2013 Payment was based on "what they would be making outside if they were free men."), 194:18-195:10 (discussion of "comfort money"); Towers Decl. ¶¶ 8, 11-13 (there was no settlement, only demands for payment of back wages); Armstrong Decl. ¶¶ 7, 9-11 (same); Tindall Decl. ¶¶ 7, 9-11 (same); Dunn Decl. ¶¶ 7, 9-11 (same); Irving Decl. ¶¶ 7, 9-11 (same).

[20] A. Farajallah Dep. at 286:1-13; S. Farajallah Dep. at 162:14-18 ("we told them, 'As quick as we receive funds, we will pay you.'"); Def.'s Interrog. Responses at 8 (AdvanFort agreed "to pay the claimants more money if and when it received insurance proceeds for the claims.").

of the allegedly injured individuals, if any, were doing at the time of their injuries.[21]

15. AdvanFort did not receive any property damage claims from any of the Guards or Crew.[22]

16. AdvanFort did not reach any settlement with the Guards or Crew regarding any claims associated with the Incident.[23]

17. The *OHIO*'s Charter Party provided that AdvanFort was responsible to pay $8,000 per day in charter hire, even if it lost access to the *OHIO* during the term of the charter.[24]

---

[21] A. Farajallah Dep. at 183:16-186:1, 208:16-212:13, 212:19-213:14, 213:19-25, 219:23-222:24; S. Farajallah Dep. at 173:12-13 ("We don't have information on the specifics."), 249:13-253:18 (admitting that the $55,000 figure for "medical expenses" in the May 2014 letter was inconsistent with AdvanFort's later evidence of having only incurred $2,571 in medical expenses, and hypothesizing that the larger figure "could be forecasted," might relate to another, undisclosed surgery for one of the Guards, or may have been paid by someone other than AdvanFort, like a charity organization).

Defendant disputes this fact by arguing that AdvanFort knows that the Crew and Guards were all beaten, suffered from depression, went on a hunger strike, and lost substantial weight while in Indian prison. Defendant's argument is unpersuasive, however, both for the reasons discussed *infra* in VI.D. and because defendant has produced no documentary evidence from anyone claiming such injuries.

[22] A. Farajallah Dep. at 217:4-7, 219:20-22, 223:8-12; S. Farajallah Dep. at 184:8-10.

[23] Def.'s Interrog. Responses at 8 (there is no written settlement agreement between AdvanFort and the Crew or the Guards); A. Farajallah Dep. at 198:12-199:11 (AdvanFort did not receive a release of claims or waiver of liability from the Guards or Crew); *id.* at 204:4-10, 207:14-23 (AdvanFort did not receive any promise or agreement from the Guards or Crew in exchange for the November 2013 Payment, but AdvanFort speculates that the payment might have caused the Guards and the Crew to stop threatening to sue AdvanFort); *id.* at 208:5-15, 223:4-7 (AdvanFort does not know what legal obligation, if any, it had to make the November 2013 Payment or if the November 2013 Payment was made in satisfaction (or partial satisfaction) of any legal obligation); *id.* at 187:22-192:11 (AdvanFort does not know with whom it negotiated the purported settlement agreement for the Guards and Crew's alleged claims); S. Farajallah Dep. at 163:6-23 (Samir Farajallah cannot identify one person who acted on behalf of the Crew or the Guards in negotiating the purported settlement with him); *id.* at 167:3-168:18 (the Guards and Crew "did not file lawsuits," but did not promise not to do so); Towers Decl. ¶¶ 11-13 (there was no settlement).

Defendant disputes this fact by arguing that AdvanFort reached an oral settlement with the Guards and Crew in January 2014, after the November 2013 payment, in which AdvanFort agreed to pay the Guards and Crew more money from any insurance proceeds it received. Defendant's argument is unpersuasive because no documentary evidence has been provided to support the existence of any settlement, and the November 2013 Payment, if it occurred, was too vague to establish an enforceable settlement agreement. *See Allen v. Aetna Cas. & Sur. Co.*, 222 Va. 361, 364 (1981) (settlement invalid where there was no means to determine the total amount to be paid).

[24] Charter Party at *1 (Block 21), *3-4 (Clause 11G addendum); S. Farajallah Dep. at 138:12-139:6 (Samir Farajallah's understanding of the Charter Party, as AdvanFort's CEO, is that "no matter what happened to the Seaman Guard Ohio, AdvanFort was going to be bound to pay the charter hire for it throughout the term of its charter").

18. AdvanFort ceased paying the *OHIO*'s charter hire as soon as the Incident occurred.[25]

19. AdvanFort claims it paid $1,125,000 to SGI in partial settlement of SGI's claims with respect to the *OHIO* around November 2013. There is no documentary evidence that supports the existence of this payment.[26]

20. AdvanFort also claims that it promised SGI that it would pay more if AdvanFort received insurance proceeds in the future.[27]

21. AdvanFort did not seek plaintiffs' approval before entering into any of the purported settlements with the Crew, the Guards, or SGI.[28]

22. AdvanFort has never received any claim, demand, or suit seeking damages or indemnity from any person who has asserted or alleged that AdvanFort was liable to the claimant for damages for physical injury, sickness, or disease related to the Incident. Specifically, Paul Towers, a Tactical Deployment Officer aboard the *OHIO*, has declared, under penalty of perjury, that neither he nor any other Guard aboard the *OHIO* ever made any claim against AdvanFort for physical injuries or illness stemming from the Incident.[29]

23. AdvanFort has never received any claim, demand, or suit seeking damages or indemnity from any person who has asserted or alleged that AdvanFort was liable to the claimant for damages for physical damage to any property related to the Incident. Specifically, all correspondence between SGI and AdvanFort that

---

[25] A. Farajallah Dep. at 319:5-14.

[26] S. Farajallah Dep. at 190:1-191:6, 205:14-23; Def.'s Interrog. Responses at 9.

[27] A. Farajallah Dep. at 295:1-4; S. Farajallah Dep. at 205:14-23; Def.'s Interrog. Responses at 9.

[28] A. Farajallah Dep. at 280:9-24.

[29] Towers Decl. ¶¶ 10-11 (neither Towers nor any other guard ever made a bodily injury claim against AdvanFort); Ian Brazier Decl. ¶¶ 10-15, ECF No. 27-46 (despite repeated requests, AdvanFort never provided plaintiffs with any information or evidence of any bodily injury claims against AdvanFort); Def.'s Interrog. Responses at 7 (Answer to Interrogatory 4); A. Farajallah Dep. at 286:14-294:3 (the $6.7 Million figure is what Ahmed Farajallah came up with as AdvanFort's estimate of what the Crew or Guards might claim based on "what they would have made monthly multiplied by the number of months"); S. Farajallah Letter of May 13, 2014, Bates Nos. 4001304-34, ECF No. 95-13, at 13-14 (discussing AdvanFort's claims for hotel expenses and living expenses (or "comfort money")), 19-20 (providing a detailed timeline of events through December 2013 with no mention of any claim for damages of any kind having been asserted against AdvanFort), 21 (AdvanFort's "initial losses . . . up to May 13, 2014" include "Sailors Payroll & Charter Hire, up to 5.31"); S. Farajallah Dep. at 185:15-186:23 (the $6.7 Million figure is AdvanFort's estimate of what the Guards' and Crew's damages are for "being in jail", based on what the Guards and Crew would have earned had they been "free men"), 228:20-231:3 (discussing May 13 letter and stating in reference to the Sailors Payroll figure that: "we agreed with them that 'We would pay you as if you were a free man.'").

references the *OHIO* solely demands payment of charter hire and overdue fees, not any payment for physical damage to the *OHIO*.[30]

24. AdvanFort has never received any claim, demand, or suit seeking damages or indemnity from any customer or client of AdvanFort who has asserted or alleged that AdvanFort was liable to the claimant for damages related to the Incident, arising out of any alleged defect in AdvanFort's provision of offshore security services to that client or customer. Specifically, Ahmed Farajallah, the acting President of AdvanFort, stated in his deposition testimony that the only claims AdvanFort received after the Incident from customers, *i.e.* clients to whom AdvanFort provided security services, stemmed from the *OHIO*'s unavailability for further service and use by AdvanFort, not from any alleged defect in AdvanFort's provision of offshore security services.[31]

25. AdvanFort has not been the subject of any judgment or arbitrator's decision finding AdvanFort liable to anyone, for any amount of damages, in any claim related to the Incident.[32]

## III.

The standard for summary judgment is too well-settled to require extensive discussion

---

[30] SGI correspondence produced by AdvanFort dated between Nov. 2, 2013 and Dec. 3, 2018, Bates Nos. 4000181-90, 192-201 (demanding payment of charter hire and overdue fees, but not referring to any physical damage to the *OHIO* or loss of use damages), ECF No. 95-14; Def.'s Interrog. Responses at 9 (claiming that SGI's claims against AdvanFort are worth $20.9 million, only $900,000 of which is for damage to the *OHIO*, but AdvanFort does not know what precise physical damage SGI claims occurred); A. Farajallah Dep. at 275:1-276:11 (AdvanFort does not know what physical damage SGI claims the *OHIO* suffered, but believes it involved navigational equipment stripped off the vessel after the Incident, damage to the hull, and damage caused by fuel remaining in its tanks while it was idle); S. Farajallah Dep. at 188:6-20 (same); S. Farajallah Letter of May 13, 2014, at 13-14 (discussing AdvanFort's claim for reimbursement of charter hire), 21 (AdvanFort's list of "initial losses" included "Charter Hire," but, as of May 2014 (six months after AdvanFort claims to have settled SGI's alleged "property damage" claim), AdvanFort did not know if the *OHIO* had suffered any physical damage); S. Farajallah Dep. at 231:4-232:2 (discussing May 2014 letter).

Defendant disputes this fact by arguing that AdvanFort knows that SGI claimed that the *OHIO* suffered damage to its hull and navigational equipment. Defendant's argument is unpersuasive, however, both for the reasons discussed *infra* in VI.D. and because defendant has produced no documentary evidence of any property damage claim.

[31] AdvanFort admits that customer claims are not at issue in this litigation. Defendant's SJ Motion, at 5, September 3, 2019, ECF No. 101; *see also* Def.'s Interrog. Responses at 10 (customer claims did not progress "from their original assertion by the claimants" and "AdvanFort does not know if they involved any defect in AdvanFort's provision of offshore security services to the claimants."); A. Farajallah Dep. at 232:18-238:16 (the only customer claims AdvanFort received were the result of the *OHIO*'s unavailability for further service and use by AdvanFort).

[32] If AdvanFort settled any claims made by the Crew, the Guards, or SGI, of which there is no documentary evidence, AdvanFort admits these alleged claims "were settled without court or arbitration proceedings." Def.'s Interrog. Responses at 8-12.

here. Simply put, summary judgment is appropriate when there is "no genuine issue as to any material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To serve as a bar to summary judgment, facts must be "material," which means that the disputed fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, at the summary judgment stage, courts must "view the evidence in the light most favorable to...the non-movant." *Dennis v. Columbia Collection Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

## IV.

Plaintiffs' FAC seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, which states that plaintiffs have no obligation to provide AdvanFort coverage, indemnity, or defense under the Policy for any loss or expense associated with the Incident whatsoever. Plaintiffs' brief in support of their motion for summary judgment argues plaintiffs are entitled to declaratory relief because:

> (i) there is no coverage for *any* claim arising out of the Incident because all potential claims relate to AdvanFort's use of the *OHIO*, which AdvanFort leased and operated at the time of the Incident, and the Policy explicitly excludes coverage for incidents involving vessels operated by or rented to AdvanFort,
>
> (ii) there is no coverage under the Policy for the claims allegedly asserted against AdvanFort by the Crew or Guards because the Crew and Guards were not engaged in Insured Services, as required by the Policy, at the time of the Incident,
>
> (iii) there is no coverage under the Policy for the claims allegedly asserted against AdvanFort by the Crew or Guards because the claims were not for Bodily Injury, as required by the Policy,
>
> (iv) there is no coverage under the Policy for the contract claims allegedly asserted by SGI (or any other party) against AdvanFort because they do not seek damages for Bodily Injury or Property Damage, as required by the Policy,
>
> (v) AdvanFort did not incur any potentially covered liabilities, or any legal

11

liability at all, to anyone as a result of the Incident,[33]

> (vi) there is no coverage for AdvanFort's alleged mitigation costs or claims expenses because the Policy does not cover reimbursement of such expenses.

Defendant's TAC, on the other hand, seek a declaratory judgment to the opposite effect as plaintiffs – that the Incident, and all liabilities stemming therefrom, were covered under the Policy – and seek damages for plaintiffs' breach of their obligations under the Policy.

Defendant's SJ Motion argues defendant is entitled to declaratory relief because:

> (i) the General Marine Liabilities section of the Policy provides coverage for the Crew's and SGI's claims against AdvanFort because the Incident was an Occurrence that arose out of Insured Services that resulted in Bodily Injury and Property Damage (capitalized terms as defined in the Policy),
>
> (ii) the Marine Employer's Liability section of the Policy provides coverage for the Guards' claims against AdvanFort because the Guards were Insured Persons who suffered Bodily Injury while engaged in Insured Services, and
>
> (iii) the Professional Indemnity section of the Policy provides coverage for all of the Guards', Crew's, and SGI's claims against AdvanFort because these claims arose out of AdvanFort's unintentional breach of authority during the performance of Insured Services and created legal liability for AdvanFort.

## V.

The Policy contains three separate coverage sections that are at issue here.[34] First, the General Marine Liabilities section provides coverage for sums that the Insured is legally liable to pay for "bodily injury" and "property damage" claims by third parties whose injuries arise out of defendant's provision of "Insured Services." Second, the Maritime Employers Liability section provides coverage for the Insured's liability for "bodily injury" claims by employees who are

---

[33] Specifically, plaintiffs argue that the November 2013 payment to the Guards and Crew and the $1,125,000 payment to SGI, if either of them occurred, did not relate to any covered liability stemming from the Incident. Moreover, there is no documentary evidence that supports the existence of either of these alleged partial settlement payments.

[34] The Policy also contains a fourth Personal Accident section, which provides coverage for accidental employee injury and illness. Defendant does not contend that it is entitled to coverage under the fourth section.

injured while engaged in "Insured Services." Third, the Professional Indemnity section provides coverage for the Insured's liability for claims arising from defendant's breach of a "professional duty" in its performance of "Insured Services." In short, all three sections of the Policy at issue limit coverage to claims arising from defendant's employees' provision of "Insured Services" and claims by employees who are injured while performing "Insured Services."[35] In addition, the Policy contains twenty-seven "General Exclusions" from coverage and six "Conditions Precedent" to coverage. If an incident falls within a general exclusion or a condition precedent is not met, the Policy provides no coverage for any resulting liability.

Under Virginia law,[36] "[i]t is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *Barber v. VistaRMS, Inc.*, 272 Va. 319, 329 (2006). The words used in the contract "are normally given their usual, ordinary, and popular meaning." *City of Chesapeake v. States Self–Insurers Risk Retention Group, Inc.*, 271 Va. 574, 578 (2006). Furthermore, although "[a]mbiguities in the instrument must be construed in favor of the insured," courts must interpret insurance policies consistent with "the clearly-stated intent of the parties." *Liberty Univ., Inc. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 532 (4th Cir. 2015).

## VI.

### A.

Here, the undisputed material facts establish, as a matter of law, that the nature and basis

---

[35] Defendant also claims it is entitled to reimbursement for its legal expenses incurred while representing the Guards and Crew against criminal charges from the Indian government. Importantly, the Policy limits plaintiffs' duty to reimburse defense costs to costs incurred "in defending a criminal charge . . . following an Occurrence *for which cover is otherwise provided.*" Policy at *14 (emphasis added). Thus, plaintiffs' obligations under the Policy to indemnify defendant for its liability for claims and for its defense costs are considered together here, as both hinge on whether there is coverage under the Policy.

[36] The Parties correctly agree that Virginia law applies to this case because the Policy explicitly states that Virginia law governs any dispute. *See* Policy at *3.

of any claims related to the Incident do not fall within the scope of the Policy. The Policy explicitly excludes coverage for any bodily injury or property damage that arises out of the use of any vessel operated by or rented to AdvanFort, unless the vessel has been declared to plaintiffs and accepted by plaintiffs. The facts establish that the *OHIO* was operated by AdvanFort at the time of the Incident, and that the *OHIO* was not declared to plaintiffs or accepted by plaintiffs. Thus, all claims related to the Incident, if any, do not fall within the scope of the Policy.

The Policy lists twenty-seven "General Exclusions." For anything that falls within these twenty-seven General Exclusions, the Policy explicitly states that the insured, AdvanFort, "shall not" be reimbursed.[37] General Exclusion 5 excludes: "Bodily Injury or Property Damage or both arising out of the...use...of any...Vessel...operated by or rented...to any Insured. This Exclusion does not apply to any Claim arising out of the operation of...any Vessels that are declared to and accepted by Insurers."[38] In other words, claims arising out of any incident involving a vessel operated by or rented to AdvanFort are excluded from coverage under the Policy, unless said vessel has been declared to plaintiffs, and accepted by plaintiffs.

The Incident, and all of AdvanFort's alleged liabilities and losses flowing from the Incident, arose out of AdvanFort's use of the *OHIO*, which AdvanFort leased and operated at the time of the Incident.[39] Since the *OHIO* was leased and operated by AdvanFort at the time, there is no coverage under the Policy for any claims associated with the Incident. *See James River Ins. Co. v. Doswell Truck Stop, LLC,* 827 S.E.2d 374, 377 (Va. 2019) (recognizing that a similar

---

[37] Policy at *19.

[38] *Id.* at 20.

[39] *See* Material Facts 3, 4.

14

exclusion was "broad in its scope" and required only "a reasonable causal connection between the ownership, maintenance or use…and the injury").

AdvanFort claims that the *OHIO* was declared to plaintiffs and accepted by plaintiffs, which would nullify the force of this General Exclusion. AdvanFort, however, has not provided any clear or persuasive evidence to support this conclusory claim. The arguments made by AdvanFort, and the documents submitted to support those arguments, are discussed *infra*.

As an initial matter, it is vital to define the terms "declare" and "accept." Neither term is defined in the Policy, but words used in a contract "are normally given their usual, ordinary, and popular meaning." *City of Chesapeake*, 271 Va. at 578. According to Webster's Dictionary, "declare" means "to make known formally, officially, or explicitly."[40] Thus, for the *OHIO* to be "declared to" plaintiffs, AdvanFort had to tell the plaintiffs explicitly that AdvanFort wanted the Policy to cover AdvanFort's operation of the *OHIO*. In addition, Webster's Dictionary defines "accept" as "to receive (something offered) willingly," "to give admittance or approval to," or "to make a favorable response to."[41] Thus, for the *OHIO* to be "accepted by" plaintiffs, plaintiffs must have admitted, approved, or made some favorable response to AdvanFort's declaration of the *OHIO*, a declaration which the evidence shows was never made.

AdvanFort argues that it declared the *OHIO* through several documents submitted with AdvanFort's application for the Policy, which mention the *OHIO* and other vessels operated by AdvanFort in descriptions of AdvanFort's business.[42] But passing reference to the existence of the *OHIO* in hundreds of pages of documents describing AdvanFort's general operations does

---

[40] *See* "Declare," Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/declare.

[41] *See* "Accept," Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/accept.

[42] *See* Defendant's SJ Motion, Undisputed Facts Number 17, at 11, September 3, 2019, ECF No. 101.

not qualify as declaring the *OHIO* to plaintiffs for coverage under the Policy. In all of the documents in the summary judgment record, there is no evidence that suggests that AdvanFort specifically requested coverage for the *OHIO*, or any other vessel AdvanFort operated. In fact, the Policy itself does not mention the *OHIO*, or any other AdvanFort-operated vessel, anywhere in its 60 pages.[43] There is no admissible, reliable evidence to support the argument that AdvanFort declared the *OHIO* to plaintiffs for coverage under the Policy.

Furthermore, even if AdvanFort had declared the *OHIO*, which did not occur, defendant would have to show that plaintiffs accepted the *OHIO* for coverage under the Policy. This never occurred. Yet, AdvanFort argues that the mere fact that the Policy was issued establishes that plaintiffs accepted the *OHIO* for coverage under the Policy.[44] This argument is completely unpersuasive. The summary judgment record contains no evidence that plaintiffs even acknowledged any request by AdvanFort to include the *OHIO* in the risk insured under the Policy, let alone that plaintiffs approved or made a favorable response to any such request. Ian Brazier, a Marine Claims Manager at Travelers, has declared under penalty of perjury that normally, vessels are covered under an insurance policy "by attaching a risk schedule that lists particular vessels," which then requires "written acknowledgement" from the underwriters of the insurance policy.[45] As already discussed, the Policy makes no mention at all of the *OHIO*, nor any other AdvanFort operated vessel, anywhere in its 60 pages. Moreover, the Policy contains no risk schedule that lists particular vessels, nor any written acknowledgement from the plaintiffs that any particular vessel operated by AdvanFort had been accepted for coverage.

---

[43] *See* Policy.

[44] *See* Defendant's SJ Motion, at 27, September 3, 2019, ECF No. 101.

[45] Ian Brazier Decl. ¶¶ 24-25, ECF No. 27-46.

In sum, General Exclusion 5 makes clear that any vessel operated by AdvanFort is not covered under the Policy unless explicitly declared to plaintiffs, and favorably accepted by plaintiffs. No admissible or plausible evidence has been presented that the *OHIO* was declared to plaintiffs, and no admissible or plausible evidence has been presented that the *OHIO* was accepted by plaintiffs. The Incident, and all of AdvanFort's alleged liabilities and losses flowing from the Incident, arose out of AdvanFort's use of the *OHIO*, which AdvanFort leased and operated at the time of the Incident. Thus, there is no coverage for any claims that arose out of the Incident because any such claims fall outside the scope of the Policy. Accordingly, plaintiffs are entitled to a declaration that there is no coverage for any of the alleged claims made by the Guards, the Crew, SGI, or any other party stemming from the Incident.

### B.

Nonetheless, assuming *arguendo* that the *OHIO* had been declared to plaintiffs, and accepted by plaintiffs, which did not occur, there is still no coverage under the Policy for defendant's alleged liability regarding any claims arising out of the Incident, because neither the Crew nor the Guards were performing "Insured Services," as required by the Policy, at the time of the Incident.

The Policy defines "Insured Services" as "[t]he provision of off-shore security services to Vessels or other off-shore units including the provision of guards on board."[46] The meaning of this provision is unambiguous; "Insured Services," or "[t]he provision of off-shore security services to Vessels," are plainly limited to protecting client vessels. First, it is clear that "the provision of off-shore security services" means actually protecting a vessel or other off-shore unit, not merely doing

---

[46] Policy at *26.

something in preparation to protect a vessel or other off-shore unit.[47] Second, and importantly, the definition of Insured Services is limited to providing security services "*to* Vessels," not "[for the benefit of] Vessels." Thus, read in its entirety, it is clear that the definition of "Insured Services"— *i.e.* "[t]he provision of off-shore security services to Vessels or other off-shore units including the provision of guards on board"—is limited to the actual protection of client vessels, not other preparatory activities that might indirectly benefit the client vessels. Indeed, at the time of the Incident, no identified client vessel even existed. Thus, neither the Crew nor the Guards could have been engaged in Insured Services at the time of the Incident.

Other provisions in the Policy confirm that the plain meaning of "Insured Services," namely protecting client vessels, is in accordance with the parties' intent at the time the parties agreed to the Policy. For example, the Policy provides that "it is understood that Insured Persons may be required to discharge weapons in a general direction or aimed at specific targets in the provision of Insured Services."[48] This provision confirms that Insured Services is limited to and is focused on protecting client vessels, which was not taking place at the time of the Incident. Nor is that the only provision of the Policy that sheds light on the meaning of Insured Services. The Policy provides coverage for "Diversion Expenses", defined as:

> Expenses incurred as a result of diversion or delay of a Vessel for which the insured is providing Insured Services . . . solely for the purpose of securing necessary treatment ashore of sick or injured Insured Persons aboard the Vessel for which the Insured is providing Insured services, provided always that the Insured is liable for such expenses under its contract to provide the Insured Services.[49]

---

[47] Likewise, there is no doubt that "the provision of guards on board," which is included within the ambit of "[t]he provision of off-shore security services to Vessels or other off-shore units," covers the actual presence of security guards on board a vessel or other off-shore unit who are providing security services. The Policy, however, does not extend to ancillary, preparatory steps taken prior to providing guards on-board the vessel or off-shore unit. In other words, "Insured Services" does not extend to the Crew or Guards of the *OHIO* because they were not performing "Insured Services" at the time of the Incident.

[48] Policy at *9.

[49] Policy at *10.

The use of the term "Insured Services" in this and the previous Policy provision confirm that the parties intended "Insured Services" to mean protecting client vessels. Guards who are protecting a client vessel from pirates may have to discharge weapons, and a client vessel may have to be diverted to seek medical treatment for guards who are protecting the vessel. Thus, there is no doubt that the plain and unambiguous meaning of Insured Services is services provided to client vessels.

In contrast, nothing in the Policy suggests that risks associated with preparing to protect client vessels qualify as "Insured Services." Defendant argues that an exclusion to the Marine Employer's Liability section of the Policy proves the contrary. The "Liability Ashore" exclusion states that:

> This section of the Contract will not cover: Liability to the Insured Person when they are ashore unless in the active service of the Vessel or other offshore units. Active service should be deemed to commence from the time the Insured Person departs for the Vessel or other offshore unit for the purpose of providing Insured Services, and then from embarkation until disembarkation at the final destination, and associated travel.[50]

Rather than supporting defendant's argument, however, this exclusion supports the opposite conclusion, namely that Insured Services do not include transport to and from client vessels under the Policy. If Insured Services included transport to and from client vessels, the exclusion would read "Insured Services should be deemed to commence from the time the Insured Person departs for the Vessel..." Instead, the Policy introduces a new term "active service" to denote this conduct. The Liability Ashore exclusion, therefore, provides further evidence that the plain, unambiguous meaning of "Insured Services" is actually protecting client vessels, not preparatory

---

[50] Policy at *10.

steps to protecting client vessels such as transporting guards to and from client vessels.[51] In any event, the Guards were not even being transported to a client vessel at the time of the Incident; the *OHIO* was refueling.

Given that the plain, unambiguous meaning of "Insured Services" is limited to protecting client vessels, and given that the undisputed facts demonstrate that the Guards and Crew were not performing "Insured Services" aboard the *OHIO* at the time of the Incident, it follows that there is no coverage under the Policy. The undisputed facts show that the Guards were merely passengers aboard their own vessel, performing tasks that, at most, can be characterized as preparation to protect client vessels, an activity not covered by the Policy. The fact that such tasks might have been performed for the benefit of clients at some future time is immaterial; the Guards were simply not providing *security* services *to* any vessel at the time of the Incident. Accordingly, it is clear that the Guards and Crew were not performing "Insured Services" at the time of the Incident.

## C.

Defendant seeks to avoid the conclusion that there is no coverage under the Policy because the Crew and Guards were not performing Insured Services at the time of the Incident by arguing that the Liability Ashore exclusion implies that there is coverage under the Policy for shuttling guards back and forth between client vessels. This argument fails, even assuming *arguendo* that this reading of the Policy is correct, because the factual record shows that the *OHIO* was not shuttling the Guards to a client vessel at the time of the Incident; the *OHIO* was refueling.

Moreover, as discussed in VI.A. *supra*, the *OHIO* was operated by AdvanFort at the time

---

[51] *See infra* VI.C. for further discussion of the Liability Ashore exclusion's applicability to this case.

of the Incident, and AdvanFort-operated vessels were excluded from coverage under the Policy unless declared to the plaintiffs, which did not occur here. Beyond this, the Policy contains six Conditions Precedent to plaintiffs' liability under the Policy. The Policy defines "Condition Precedent" as a "requirement of this Contract with which the Insured must comply. Any failure will mean that the Insured may not be reimbursed under this Contract for any Claim."[52] One of the Conditions Precedent is "Contractual Agreement," which states:

> There is a contract in place between the Insured and their Client with the Insured's responsibilities and liabilities being no more onerous than those in the unamended Baltic and International Maritime Council's GAURDCON 2012 contract unless otherwise agreed and approved by the Insurers.[53]

There is no evidence of any contract between AdvanFort and any client pertaining to any of the Crew or Guards aboard the *OHIO* at the time of the Incident. As a result, a condition precedent to coverage under the Policy was not met, and, thus, the Liability Ashore exclusion, however read, does not cover any claims against defendant arising out of the Incident.[54] None of the Guards on the *OHIO* could be in "active service" at the time of the Incident as there were no contracts in place between AdvanFort and a client vessel and the *OHIO* was simply refueling, not heading to meet any client vessel.

Thus, no reading of the Liability Ashore exclusion provides coverage under the Policy for any of AdvanFort's alleged liabilities arising out of the Incident.

---

[52] Policy at *25.

[53] Policy at *13.

[54] The failure to satisfy this contractual agreement condition precedent likely bars coverage under the Policy for any of AdvanFort's alleged liabilities or claims arising out of the Incident, not merely the applicability of the "active service" term in the Liability Ashore exclusion. Although plaintiffs alleged this position in Count 6 of their FAC, plaintiffs have not argued for summary judgment on those grounds in either their brief in support or their reply motion. As such, the Court does not address the merits of that argument in any greater length.

**D.**

Moreover, even assuming, *arguendo*, that (i) the *OHIO was* declared to plaintiffs and

accepted by plaintiffs, (ii) AdvanFort *had* contracts with clients for the Guards aboard the *OHIO*

to perform security services, and (iii) the Guards *were* performing "Insured Services" while the

*OHIO* was refueling, none of which is true on this factual record, there would still be no

coverage under the Policy because defendant would still have to show defendant incurred legal

liability as a result of a "Bodily Injury" or "Property Damage" claim that arose out of the

"Insured Services" performed during the Incident. Here, defendant has produced no evidence of

any such claims by the Crew, Guards, SGI, or any other party, despite being required to produce

such information in discovery.

It appears from this factual record that no "Bodily Injury" claims were ever made against

AdvanFort.[55] AdvanFort claims that the Crew and Guards asserted claims against AdvanFort

"for the harm [the Crew and Guards] suffered while in jail, and for the time they were in jail."[56]

Yet, AdvanFort cannot identify any specific physical injury, sickness, or disease for which any

of the Crew or Guards claimed AdvanFort was legally responsible.[57] Rather than Bodily Injury

claims, the Crew and Guards asked AdvanFort to pay them the *wages* that AdvanFort had

stopped paying as soon as the Crew and Guards were arrested.[58] Ahmed Farajallah's and Samir

---

[55] "Bodily Injury" is defined in the Policy as "[p]hysical injury, sickness, or disease sustained by any person, and including mental injury, mental anguish or death resulting from physical injury, sickness or disease." Policy at *25.

[56] Def.'s Interrog. Responses at 8.

[57] *See* Def.'s Interrog. Responses at 9 ("In addition to not knowing about the claims on an individual basis, there are many details that AdvanFort does not know about the claims. AdvanFort does not know the dates of the beatings, how badly the men were hurt by the beatings, who did the beatings, how they were beaten, and where they were beaten. AdvanFort does not know how long the hunger strike lasted who started it, and hot it was resolved.").

[58] *See supra* Material Fact 12 and note 19.

Farajallah's depositions emphasized that the Crew's and Guards' claims related to unpaid wages, not bodily injury. Ahmed Farajallah stated that the $6.7 million in alleged damages was calculated based on "what [the Crew and Guards] would have made monthly multiplied by the number of months."[59] Similarly, Samir Farajallah stated that the $6.7 million figure represented the Crew's and Guard's damages for "being in jail" based on what the Crew and Guards would have earned had they been "free men."[60] Moreover, Guards Paul Towers, John Armstrong, Nick Dunn, Ray Tindall, and Billy Irving have all declared that they never asserted any bodily injury claims against AdvanFort.[61] And Paul Towers, as "the only one of the guards who communicated directly with AdvanFort while [they] were detained in India," further declared that no one else asserted any bodily injury claims against AdvanFort either.[62]

Thus, any alleged claims made by the Crew or Guards were claims for the payment of back wages. Back wages do not fall within the Policy's definition of "Bodily Injury."[63] Since no Bodily Injury claims were ever made against AdvanFort, there is no coverage under the Policy for AdvanFort's alleged liabilities to the Crew or Guards stemming from the Incident.

Similarly, the claims allegedly asserted against AdvanFort by SGI and AdvanFort's clients are not covered under the Policy because these alleged claims do not seek damages for "Bodily Injury" or "Property Damage." Instead, the alleged claims asserted against AdvanFort by SGI and AdvanFort's clients are contract claims. Under Virginia law, a general liability

---

[59] A. Farajallah Dep. at 286:14-294:3.

[60] S. Farajallah Dep. at 185:15-186:23.

[61] *See supra* note 19.

[62] Towers Decl. ¶ 11.

[63] *See supra* note 55.

policy that provides coverage for the insured's legal liability for property damage does not cover the insured for contract damages; it covers the insured solely for tort liability. *Boiler Brick & Refractory Co. v. Maryland Cas. Co.*, 210 Va. 50, 52 (1969).

AdvanFort seeks to avoid this result by arguing, implausibly, that these alleged claims are property damage claims.[64] The Policy defines "Property Damage" as "[p]hysical damage to tangible property...or destruction of tangible property..., including loss of use of tangible property...so damaged or destroyed."[65] AdvanFort argues that SGI's purported claims against AdvanFort are worth $20.9 million, and that AdvanFort paid $1,125,000 to SGI in late 2013, in partial settlement of SGI's claims. Of the $20.9 million figure, only $900,000 is for alleged physical damage to the *OHIO*.[66] The remaining $20 million consists of AdvanFort's alleged contractual obligation to pay charter hire and late delivery fees to SGI under the Charter Party, as AdvanFort was obligated to pay charter hire fees regardless of whether AdvanFort had access to the *OHIO*.[67] Thus, the $20 million in alleged damages unquestionably constitutes contract damages, for which the Policy provides no coverage.

The $900,000 of alleged damages to the vessel, supposedly involving damage to the navigational equipment, the hull, and the fuel tanks of the *OHIO*,[68] does appear, at first blush, to amount to a property damage claim. On closer inspection, however, the record provides no

---

[64] AdvanFort does not allege that SGI or any customer asserted any Bodily Injury claims against AdvanFort. Def.'s Interrog. Responses at 9 (describing SGI's claims as property damage claims); A. Farajallah Dep. at 234:20-235:6 (there were no personal injury claims by any customers).

[65] Policy at *27.

[66] Def.'s Interrog. Responses at 9.

[67] Def.'s Interrog. Responses at 9; A. Farajallah Dep. at 319:5-14.

[68] A. Farajallah Dep. at 275:1-276:11.

evidence that any such claims actually exist. All of the correspondence between SGI and AdvanFort, produced by AdvanFort in discovery, demands payment of charter hire and overdue fees, but does not refer to any claim for physical damage to the *OHIO*.[69] Significantly, a letter from Samir Farajallah, then CEO of AdvanFort, to Ian Brazier of Travelers on May 13, 2014, which outlines AdvanFort's claims to date from the October 2013 Incident, specifically notes that AdvanFort "do[es] not know whether the vessel suffered Property Damage," but does make a claim for "Charter Hire" fees.[70] Although AdvanFort did not know whether the *OHIO* had suffered property damage in May 2014, AdvanFort had allegedly already paid $1,125,000 to SGI in partial settlement of SGI's claims against AdvanFort months earlier.[71] Thus, this alleged partial settlement payment could not have been related to property damage. And moreover, the summary judgment record provides no evidence that SGI has ever made a claim against AdvanFort for property damage to the *OHIO* at any point after May 2014.

In the end, even assuming, as is not true, that (i) the *OHIO* *was* declared to plaintiffs and accepted by plaintiffs, and assuming further that (ii) AdvanFort *had* contracts with clients for the Guards onboard the *OHIO* to perform security services, and assuming further that (iii) the Guards *were* performing "Insured Services" while the *OHIO* was refueling, there is *still* no coverage under the Policy for any of AdvanFort's alleged liabilities arising out of the Incident because there have been no "Bodily Injury" or "Property Damages" claims brought against

---

[69] *See* SGI correspondence produced by AdvanFort dated between Nov. 2, 2013 and Dec. 3, 2018, Bates Nos. 4000181-90, 192-201, ECF No. 95-14.

[70] S. Farajallah Letter of May 13, 2014, at 21, ECF No. 95-13.

[71] As previously discussed in reference to the alleged November 2013 Payment to the Crew and Guards, the $1,125,000 SGI payment, if it occurred, was too vague to establish an enforceable settlement agreement. *See Allen v. Aetna Cas. & Sur. Co.*, 222 Va. 361, 364 (1981) (settlement invalid where there was no means to determine the total amount to be paid).

AdvanFort, as required by the Policy.

## VII.

In sum, there are multiple reasons why there is no coverage under the Policy, any one of which is fatal to AdvanFort's claim to the contrary. First, any and all claims pertaining to the Incident are barred from coverage under the Policy because the *OHIO* was operated by and rented to AdvanFort at the time of the Incident, and AdvanFort had not declared the *OHIO* to plaintiffs, nor had plaintiffs accepted the *OHIO* for coverage, as required by the Policy. Second, the factual record establishes that the *OHIO* was refueling at the time of the Incident, not providing off-shore security services or even traveling to any identified client vessel. Thus, "Insured Services" were not being provided at the time of the Incident, as required by the Policy, and therefore, the Policy does not provide coverage for any claims arising out of the Incident. Third, the Policy does not provide coverage for any claims arising out of the Incident because no legitimate claims of "Bodily Injury" or "Property Damage" have been brought against AdvanFort by the Crew, the Guards, SGI, or any other party, as required by the Policy. Accordingly, the summary judgment factual record establishes that the Policy does not provide coverage for any alleged claims against, or liabilities incurred by, AdvanFort with respect to the Incident.

For the reasons set forth above, plaintiffs' motion for summary judgment must be granted and defendant's cross-motion for summary judgment must be denied.

An appropriate order will issue separately.

The Clerk is directed to provide a copy of this Opinion to all counsel of record.

Alexandria, Virginia
October 21, 2019

T. S. Ellis, III
United States District Judge